FILED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2014 NOV 13  P 4: 19

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

KEVIN W. CLARK
405 North Fillmore Avenue
Sterling, Virginia 20164

      Plaintiff,

      v.

ZAYO GROUP, LLC
400 Centennial Parkway
Suite 200
Louisville, Colorado 80204

      Defendant.

Civil Action No. 1:14CV1507 CMH/JFA

## COMPLAINT

Plaintiff Kevin W. Clark, by and through undersigned counsel, for his Complaint against defendant Zayo Group, LLC, alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over the federal claims of the plaintiff in this action pursuant to 28 U.S.C. Section 1331, because the subject matter of Clark's claims are premised on violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. Section 201 *et seq.*

2.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391 as the facts relevant to this matter occurred in Fairfax County, Virginia.

### PARTIES

3.     Plaintiff Kevin W. Clark is a Virginia resident, and former employee of Zayo Group, LLC ("Zayo").

4.      Zayo is a Delaware Limited Liability Company, having its principal office at 400 Centennial Parkway, Suite 200, Louisville, Colorado 80027.

5.      Zayo's annual business done and sales exceeds $500,000.00.

## FACTS

6.      Clark began working for Zayo's predecessor, AboveNet, Inc., in May 2008.  Clark worked as an IP Operations Engineer, in AboveNet's Herndon, Virginia office.

7.      As an IP Operations Engineer, Clark was a member of a team of Internet Protocol ("IP") engineers responsible for monitoring and repairing AboveNet's Internet Protocol system, which provided high bandwidth internet connections to large corporate enterprises and communication carriers.

8.      AboveNet paid IP Operations Engineers on an hourly basis, and often, engineers worked more than forty hours a week.  AboveNet paid engineers overtime when they worked more than forty hours in a work week.

9.      During his time working for AboveNet, Clark received excellent reviews from his supervisors because of his nearly two decades of experience with global internet service providers, his valuable contributions in documenting processes and procedures, and his enthusiasm and professionalism in dealing with both complaining customers and his coworkers.

10.     On June 2, 2012, AboveNet announced that its shareholders had approved a buyout by Zayo, a large communications and fiber network company.

11.     Zayo is a private employer engaged in interstate commerce, and its gross revenues exceed $500,000 per year.

12.     Clark was an employee of Zayo from June 2012 until May 2013.

13.     When Zayo purchased AboveNet in June 2012, Clark stayed in the IP Operations Engineer Position he had held for AboveNet.  Clark's supervisors continued to praise his work.

2

14.     On November 15, 2012, Clark's supervisors promoted Clark to the Manager of Global IP Operations.

15.     In that position, Clark was a second-line supervisor for IP technicians, and a first-line supervisor for the shift lead. The shift lead supervised the technicians, while Clark supervised the shift lead and dealt with problems that neither the technician nor shift lead could adequately address.

16.     Also, as Manager of Global IP Operations, Clark performed managerial duties (i.e. timesheet approvals, scheduling, performance reviews, interviews, and metrics reporting) for all IP Operations Engineers in Herndon, VA; Tulsa, OK; and other remote locations globally. Clark provided a third line of escalation for the IP Operations team, supporting technicians and team leads with advanced troubleshooting and issue resolution. Clark also served as the last customer-facing technical point of escalation for Zayo's global network, and was perpetually on-call.

17.     Clark was also responsible for conducting the technical interviews for all IP Operations candidates and was present during the majority of all phone interviews of potential new hires.

18.     Clark's immediate supervisor was Edwin Pagan, Director of the Network Control Center. Edwin Pagan held that position until February 2013, when Clark and his team was moved under a newly created position, Director of IP Operations, filled by Stephen Vaca.

19.     Clark's second-line supervisor was the Senior Vice President of the Network Control Center, Greg Hadlock.

20.     As Manager of IP Operations, Clark supervised Tier II technical representatives, who fielded calls from customers related to internet service outages. Following a script, the Tier II technical representatives would log into the system or device nearest the customer and observe the connection.

21.     In the absence of errors indicative of transmission or reception problems, the Tier II representative would inform the customer that the problem arose from the customer's own system or device, which the customer would need to investigate.

22.     If the system or device was not connected to the internet, or showed consistent transmission or reception problems, the Tier II representative would fill out a "trouble-ticket" to document the complaint, add their observations, then dispatch two Field Services Technicians, one to the customer's location, and another to the relevant Zayo system.

23.     These two technicians operated without further instruction from the Tier II representative. They each placed a testing device on the relevant hardware—one at the customer's location, and the other at the Zayo site—and from that point the testing devices ran automated tests to locate the connectivity problem.

24.     The testing devices would issue an automated report indicating whether the internet line was good or bad. If the line was good, then the issue was with the hardware, either the customer's or Zayo's. If the line was bad, a field technician would repair it with no involvement from the Tier II representative.

25.     The Tier II representatives almost never fixed issues themselves. Instead they identified issues according to a script and either passed them up to a Tier III representative (or Clark) for software or routing problems, or to a field technician for hardware replacement.

26.     The only instances in which the Tier II representatives would themselves resolve customer calls was when a customer called seeking a minor DNS entry to allow entry into their files, or when uncovering peering issues, which were simply typos that were entered during the installation phase. These "fixes" involved only administrative record keeping, falling within the "help desk" purview.

4

27.     The Tier II representatives rarely had to apply their own problem-solving skills or utilize any highly specialized knowledge of computers or software. They managed help desk tickets, answered calls, and helped customers by making predetermined recommendations in a system designed and created by others.

28.     Zayo continued to pay Clark hourly when Clark was the Manager of IP Operations. After Clark's promotion, Clark made $44.12 per hour for regular time, $48.53 per hour for shift time, and $66.18 per hour for overtime.   Post-promotion, VP Hadlock indicated that he wished to keep Clark on an non-exempt hourly pay basis to ensure he was "compensated for his long hours". All Zayo's internal systems were changed to reflect Clark's promotion.

29.     Zayo's IP Operations team, which Clark supervised, was also paid hourly.  Upon information and belief, several were paid less than $25 per hour.

30.     Zayo required that Clark work long hours after he was promoted to Manager of IP Operations.  Clark was on-call around the clock.  For instance, from January through mid March 2013, Clark worked 904 hours, averaging between ninety and one hundred hours per week.

31.     Following his promotion in November 2012, Clark continued to be a high performer as a Manager of IP Operations, and consistently received positive reviews from his supervisors, performance-based bonuses, and excellent feedback from customers and his team.

32.     Soon after his promotion, Clark learned that Zayo was attempting to cut costs by refusing to hire more IP personnel, although technicians, leads, and managers all worked longer hours and at a rapid pace, dealing with more customer complaint tickets per shift than they had previously under AboveNet.

33.     Clark also learned that Zayo was reluctant to hire experienced technicians because of their higher salary demands.  As a result of this practice, team leads and IP managers had greater

responsibility and higher workloads, as technicians needed assistance more often when dealing with customer issues.

34.    In Jan 2013, Zayo hired Daryl Whalin to be the Junior Manager of IP Operations at Zayo's Tulsa, Oklahoma office.   Pagan told Clark that he would remain the "Senior Manager" of IP Operations.

35.    On February 25, 2013, Zayo hired Stephen Vaca as the new Director of IP Operations. In that position, Vaca was Clark's first line supervisor.

36.    From July 2012, when Zayo acquired Abovenet, Zayo continued to expand its customer base, acquiring more national networks at a rate of roughly one network every two months. Clark's team was responsible for handling customer complaints from these new, large networks. Despite the increasing workload, Zayo allowed staffing to dwindle by almost fifty percent by not filling vacated positions over the first four months of 2013.

37.    In February 2013, a scheduled technician missed work, leaving the IP Operations staff short-handed on a Friday night shift.  In response, VP Hadlock requested that the managers formulate an on-call policy to ensure that the staff would always have adequate coverage.

38.    In early March, Clark called a staff meeting with the remaining Herndon team to discuss the probable implementation of an on-call policy. Several IP Engineers expressed concern over the structure of compensation for on-call time and whether it might constitute a violation of their rights under FLSA. Clark researched the matter.

39.    On March 17, 2013, Whalin released a written policy that was met with unanimous unfavorable response from the team. The scope of the on-call policy was limited to instances of unplanned absences where the on-call tech would then be asked to cover the entire shift.

40.    On April 1, 2013, Vaca requested Clark engage the on-call during a fully-staffed shift. Vaca told Clark that IP Operations would immediately be changing the policy to provide an

extra employee on shift to man the phones lines and be available "for as long as we [IP Operations] remained busy". The revised policy would require technicians to be "on-call" to deal with problems that the scheduled staff were too busy to handle.

41.     On April 2, 2013, Vaca provided Clark a new policy that would require technicians to be "on-call" to deal with problems that the scheduled staff were too busy to handle.

42.     Vaca distributed the following job description for the on-call technician:

> "On call tech:
>
> Answer call immediately via mobile or home phone.
>
> Report to duty within 30 minutes Support any requested staff augment needs for an outage, OOS ticket support, scheduled activation during swing or overnight shift, someone calls in sick, or if manager assigns any work related task that needs to be completed to support our customers.
>
> Tech will need to be able to engage remotely or in office if they do not have a laptop. We will not issue any new laptops, nor will we provide mobile phone at this time. We will reimburse for any actual time worked and any cost of billed minutes related to LD calls (receipts required).
>
> We should have one laptop in Herndon and one in Tulsa that can be used for the on call rotation. If day shift personnel already have a work issued laptop then they will be in the rotation.
> I believe we only had one call out during the first week of the on call rotation and we could have used yesterday.
>
> Please advise if you have any questions."

43.     Clark was immediately troubled by this directive, as he realized that it would require technicians to work without pay for a large portion of their on-call shifts, and that they would have to wait by their phones and computers to answer calls. In fact, Vaca told Clark that "basically, only time spent on the phone would constitute billable time by the technician."

44.     Many of the technicians' duties involved waiting for callbacks from field technicians and telecom companies. Under Vaca's plan, this time would not be compensated, nor would the

time spent documenting issues in the case files. Vaca told Clark that "[a]nyone who has a problem with it can call me directly and I will adjust their attitude".

45.     Vaca's on-call directive required the on-call person to be available to answer service calls immediately; perform the full range of work of scheduled technicians, including dealing with customer complaints and service outages, as well as activation of new users; and to complete additional assignments the IP Operations team needed.

46.     Clark asked Vaca to clarify what the directive to engage remotely or from the office required, and Vaca informed him that technicians would have to be able to reach the office within fifteen minutes of being called to perform work that had to be done in-office, and start the work within thirty minutes of the call.

47.     On April 2, 2013, Clark researched the FLSA overtime requirements and came to believe that the new policy violated FLSA laws as the on-call technician would not be paid for time for which they had to wait by a phone and laptop, wait for callbacks, or remain within fifteen minutes of Zayo's Herndon, Virginia office.

48.     Of Clark's team, Clark lived the closest to the office and had a twenty-minute commute. Many of Clark's subordinates had commutes longer than an hour, and therefore would have to remain in the office throughout their twenty-four hour on-call shift, while only being paid for the time they spent actually working billable time for customers.

49.     On the evening of April 2, 2014, Clark informed Vaca that he believed the new policy violated FLSA overtime laws and shared his research into the law.  Clark urged Vaca to discuss the policy with Zayo's legal department or human resources ("HR") employees.

50.     Clark also expressed his concerns that the company, and each manager individually, could get into trouble for violating the FLSA. Clark informed Vaca that he while he did not want to

engage in insubordination, Clark would not violate FLSA laws, via email, copying VP Hadlock and Whalin.

51.     On April 5, 2013, after Vaca refused to address Clark's concerns, Clark forwarded his complaint to Zayo human resources employees Laura Martinez, Bonnie Peterson, and Senior Vice President and Chief of Staff Sandi Mays, who oversaw Zayo's human resources department.

52.     In Clark's email to Martinez, Peterson, and Mays, he informed them that Vaca had refused to address his FLSA concerns.  Clark also expressed his belief that he should be protected from retaliation for his FLSA-protected activity.

53.     Later on the afternoon of April 5, 2013, Edwin Pagan, who had been promoted to Director of the Network Control Center, emailed the IP Operations team and announced that Clark would "continue in his role of team lead," while Daryl Whalin would be the "manager of record."

54.     Clark had never been a team lead, but instead, had been the Senior Manager of IP Operations in the Herndon, Virginia office, while Daryl Whalin had been the Junior Manager of IP Operations in the Tulsa, Oklahoma office.

55.     Pagan's shifting of Clark's role was a demotion.

56.     Accordingly, in his email, Pagan instructed the IP Operations team that he was sending each forms to change their manager from Clark to Whalin.

57.     Further, Pagan's email directed all team members to keep their complaints within their team in the future, and to speak with either Vaca or Pagan before escalating complaints up the chain of command.

58.     Pagan's April 5, 2013 email stated that "[i]t is inappropriate to insinuate that the company is doing something wrong, before you have escalated the matter within your team."

59.     Zayo human resources employees instructed team members that they had twenty-four hours to return the forms that changed their manager from Clark to Whalin.

60.     Zayo human resources employees also threatened Clark's team that they would be terminated for insubordination should they refuse to the sign the change of manager forms, which were back-dated with an effective date of March 15, 2013.

61.     On April 5, 2013, Clark emailed Zayo Senior Vice President and Chief of Staff, who oversaw Zayo's human resources ("HR") department, Sandi Mays.

62.     Clark asked Mays why his team was being forced to consent to the change of manager, and why that change was backdated to the middle of March 2013. Mays refused to respond.

63.     On April 8, 2013, Vaca and Clark met in Clark's office to discuss the policy. Clark again explained to Vaca that he believed the new policy would violate the FLSA. Vaca stated that he was experienced with similar schemes through other companies, and that Clark should not worry about it.

64.     Further, Vaca informed Clark he would be put back on shift work, which meant he would no longer be a manager, or a lead as Pagan's previous email stated but rather a technician. This was a second demotion.

65.     When Clark remarked this was a demotion, Vaca retorted, "you're not being demoted because there is no paperwork... let me rephrase, do you have any promotion paperwork?" He went on to say, "I show you in the system as IP Technician, and that's how I want things to go"

66.     Clark asked Vaca about the demotion, and Vaca falsely claimed that Clark had never been a manager, despite the fact that all of Zayo's internal systems listed Clark as Manager of IP Operations, as well as their escalation sheets, website, internal employee directory, and many other company documents.

67.     Clark told Vaca that he felt he was unlawfully being retaliated against for questioning the legality of Vaca's policy.

68.     As a result of Zayo's demotion of Clark, Clark's work schedule was cut from between ninety and one hundred hours per week, to just forty.  Consequently, this drastically reduced his compensation.

69.     As a result of Zayo's demotion of Clark, Clark was entrusted with less responsibility, was forced to vacate his office, was no longer qualified for management-tier bonuses, and was less likely to receive promotions, as he had over the first several years of his employment with Zayo and Above-Net.

70.     On April 9, 2013, Clark forwarded his original complaint to Vaca as well as his complaint to Martinez, Peterson, and Mays to ADP (Zayo's payroll and HR services company) HR employee Jorge Llamas.

71.     Clark told Llamas that he had been retaliated against because of his complaints.

72.     Llamas told Clark that he forwarded Clark's complaints to ADP's FLSA experts Donna Echeverria and Abraham Gonzales.

73.     Despite Zayo's humiliating and unlawful demotion of Clark, Clark attempted to continue to perform his job duties.  However, on April 9, 2013, after his inquiries for a work schedule and clarification of his responsibilities went unanswered, the stress of his demotion caused Clark to suffer from severe and prolonged panic attacks, dizziness, and nausea.

74.     After multiple requests to ADP for status on his complaint, Clark was finally contacted on April 11, 2013, via teleconference, to initiate the investigation.  ADP representative, Abraham Gonzales and Zayo Chief of Staff, Sandi Mays led the investigation.  Clark questioned the appropriateness of Mays' involvement as she was mentioned specifically, as an involved party, in his original complaint to ADP.  The tone of the call was hostile, as Mays pressured Clark to divulge

11

names of team members who had complained and/or reported being threatened.  The investigation completely ignored Clark's claim of retaliation or his underlying FLSA concerns.

75.     On April 18. 2013, Clark took Family Medical Leave Act leave on the advice of his physician Dr. Stephen Tang. Clark had accrued paid time off, which would allow him to take time off until May 3, 2013.  Zayo approved Clark's use of medical leave and paid time off.

76.     Zayo terminated Clark's employment on May 1, 2013, two days before the end of his approved leave.

77.     Zayo falsely characterized Clark's termination as a lay-off, claiming that they had decided "to consolidate the 24 x 7 operational support functions of the Network Control Center. Into the Tulsa Operational Center."

78.     Aside from Clark, the only other immediate termination in the IP Operations group was Bill Hanforth, who was told "off the record" that his termination was directly related to the FLSA complaint

79.     Zayo's termination of Clark was in retaliation for the protected complaints he made to Vaca, Pagan, Senior Vice President Greg Hadlock, and Mays, as well as various HR personnel.

80.     On May 15, 2013, Abraham Gonzalez sent Clark a letter stating that Zayo and ADP's investigation into Clark's claims of FLSA violation found no violation and no retaliation.


## COUNT I: RETALIATION IN VIOLATION
## OF THE FAIR LABOR STANDARDS ACT
### 29 U.S.C. § 216

81.     Clark re-alleges every allegation contained in this complaint as if fully set forth herein.

82.    At all times relevant herein, Zayo has and continues to be an "employer" within the meaning of the FLSA.

83.    At all times relevant herein, Clark was employed with Zayo as an "employee" within the meaning of the FLSA.

84.    Because Clark engaged in protected activity by filing complaints within the meaning of the FLSA, Zayo unlawfully discriminated against Clark by demoting him, reducing his compensation, and then discharging Clark from his employment.

85.    As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

86.    As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

87.    In acting as alleged above, Defendants acted with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages from Defendants in amounts to be proved at trial.

88.    As a result of Defendants conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## JURY DEMAND

89.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Kevin Clark prays for the following relief:

Entry of judgment in favor of Plaintiff and against Defendant for:

a.   Back pay;

b.   Front pay;

c.   Compensatory damages;

d.   Punitive damages;

e.   Liquidated damages;

f.   Reasonable attorneys' fees and court cost associated with this suit;

g.   Awarding prejudgment interest, costs and disbursement as appropriate herein; and

h.   Other such relief as may be appropriate to effectuate the purposes of the FLSA, and

as this Court and jury deems equitable, appropriate, and just.

Respectfully Submitted,

Jack B. Jarrett
VA Bar # 86176
The Spiggle Law Firm, PLLC
4830B 31st St., S.
Arlington, Virginia 22206
(202) 499-6998 (phone)
(202) 540-8018 (fax)
jjarret@spigglelaw.com
ATTORNEY FOR PLAINTIFF